George LYNN and Terrance
Beauchamp, Plaintiffs–
Appellees,

v.

CITY OF DETROIT, et al., Defendants,

and

David Anderson, Julius Tate, Alisha
Terry, and Phillip Ferency,
Defendants–Appellants.

No. 02–2123.

United States Court of Appeals,
Sixth Circuit.

April 5, 2004.

Before NELSON, CLAY, and COOK, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

The question presented in this appeal is whether the defendants—two lieutenants and two sergeants in the Detroit Police Department—are entitled to qualified immunity from suit on constitutional claims arising from the misconduct of four rogue police officers under the defendants' command. The subordinate officers were guilty of a string of illegal searches, false arrests, and thefts; the plaintiffs were among their victims.

The defendants' entitlement to qualified immunity turns on whether the defendants knowingly acquiesced in their subordinates' unconstitutional conduct, to the plaintiffs' injury. Unlike the district court, we believe that the facts of the case, which are undisputed, evince neither the requisite acquiescence nor the requisite causation. On the contrary, the record shows that the defendants reported (or understood that others had reported) specific complaints against the rogue officers to the department's Internal Affairs Division, whose responsibility it was to investigate such complaints. There has been no showing that if the defendants had acted differently, the Internal Affairs Division would have put a stop to the misconduct earlier and thus saved the plaintiffs from being victimized. The district court's order denying the defendants' motion for summary judgment will be reversed.

I

On February 10, 1996, Detroit police officers Kenneth Owens, Arnold Redd, Christopher Hatcher, and Dennis Radford—all of whom were assigned to the third shift, or platoon, at the 6th Precinct—decided to raid what they thought was a drug house. Redd used a pay phone to call in a false 911 report, and the four officers responded to the ensuing radio call. With guns drawn, they entered the house in question, handcuffed the four men who were present, and searched the premises. Owens "went upstairs and came down with drugs," which he apparently had planted himself. The officers arrested George Lynn and Terrance Beauchamp, two of the men who were in the house, and took about $400 from them. It is Lynn

and Beauchamp who are the plaintiffs in this action.

The officers filed false reports stating that Lynn and Beauchamp had been caught with substantial quantities of heroin and cocaine. According to the reports, the officers confiscated $61 (not $400) in cash along with the narcotics. Charged with possession of controlled substances with intent to deliver them, Lynn and Beauchamp pleaded guilty in order to avoid lengthy prison terms. Later, when the officers' wrongdoing came to light, the convictions were set aside.

In the spring of 1996, officers of the Internal Affairs Division of the Detroit Police Department began to investigate Owens, Redd, and other members of their platoon. About a dozen complaints alleging theft by Owens or Redd had been received by Internal Affairs, beginning in 1995. The investigation, which lasted between 18 months and two years, led to the indictment of Owens, Redd, Hatcher, Radford, and six other officers on charges that included conspiracy, deprivation of civil rights, use of firearms during crimes of violence, possession of stolen firearms, and possession of cocaine. Each of the officers pleaded guilty or was convicted at trial.

The defendants herein, David Anderson, Alisha Terry, Phillip Ferency, and Julius Tate, are police sergeants and lieutenants who were responsible for supervising the third platoon at the 6th Precinct. It is undisputed that none of these supervisors was personally involved in the arrests of Lynn and Beauchamp. Each of the supervisors gave deposition testimony, which we summarize here, concerning his or her knowledge of criminal activity in the platoon prior to February 10, 1996, and his or her responses to such knowledge.

Sgt. Anderson was aware in 1995 or 1996 that several of the officers under his supervision, including Owens, Redd, Hatcher, and Radford, were widely suspected of criminal activity. Anderson himself was suspicious of the officers because "they made a large amount of narcotics arrests and they rarely recovered any money." Anderson also knew that the officers made "informal raids on drug houses." He discussed his suspicions "[d]ozens" of times with Ferency, Terry, Tate, and other supervisors, but, lacking "solid proof" of wrongdoing, he did not report the officers to Internal Affairs. Anderson monitored the officers on some of their runs but witnessed no criminal activity. He did nothing else with respect to his suspicions. Anderson knew that citizens were complaining "almost daily at times" about robberies committed by the officers, but he did nothing in response to those complaints. He assumed that "whoever took the complaint would notify Internal Affairs and they would investigate it."

Beginning in November of 1995, Sgt. Terry heard rumors about criminal activity by officers in her platoon. These rumors concerned officers' stealing jewelry and cash from crime scenes. Terry did not report the rumors to Internal Affairs or change the manner in which she supervised the officers. She was not aware of any citizen complaints of robbery.

Lt. Ferency received three to five citizen complaints of theft by officers under his command. He reported these complaints. Ferency was often told by other officers that his platoon was "crooked," but no one ever gave him any specifics. He reported the general allegations to his supervisor, as well as to Internal Affairs.[1] He also

---

1. As the dissent notes, there is no evidence that Lt. Ferency – or Lt. Tate, for that matter – was requested or advised by Sgts. Anderson or Terry to report allegations of wrongdoing to Internal Affairs. Neither is there evidence that Sgts. Anderson or Terry

discussed the allegations with the sergeants working under him, including Sgt. Anderson and Sgt. Terry. Ferency "mentally pick[ed] apart" all of the officers' reports, but he did not change the way he observed the officers. On one occasion, Lieutenants Ferency and Tate discussed the fact that certain officers were recovering large quantities of drugs but no money. In Ferency's eyes, however, "everything seemed to be okay because the prisoners never made any allegations."

Lt. Tate took a complaint in July of 1995 from a man who said Owens had robbed him. He had a sergeant complete a report, and he understood that Internal Affairs was advised of the complaint. Between July of 1995 and November of 1996, Tate heard rumors of criminal activity by officers in his precinct. At the time of his deposition, Tate could not recall the nature of the rumors.[2]

Lynn and Beauchamp sued Owens, Redd, Hatcher, Radford, and others under 42 U.S.C. § 1983 and state law. The case was removed to federal district court, but the court remanded all state-law claims. The plaintiffs then filed an amended complaint that added Anderson, Terry, Ferency, and Tate as defendants. These defendants[3] moved for summary judgment on the basis of qualified immunity.

After hearing oral argument, the district court denied the motion. The court held that the defendants' inaction amounted to knowing acquiescence in the subordinate officers' unconstitutional conduct. The defendants have filed a timely appeal.

II

■ This court has jurisdiction to hear the defendants' interlocutory appeal from the denial of qualified immunity only if the appeal "involves the abstract or pure legal issue of whether the facts alleged by the plaintiff constitute a violation of clearly established law." *Shehee v. Luttrell,* 199 F.3d 295, 299 (6th Cir.1999) (internal quotation marks omitted), *cert. denied,* 530 U.S. 1264, 120 S.Ct. 2724, 147 L.Ed.2d 988 (2000). Thus, the defendants "must be willing to concede to the facts as alleged by the plaintiff[s] and discuss only the legal issues raised by the case." *Id.*

The plaintiffs contend that the defendants have not conceded the plaintiffs' version of the facts for purposes of this appeal. We disagree. The defendants do not dispute the plaintiffs' account of the events of February 10, 1996. Nor do they dispute the plaintiffs' account of what the defendants knew about the corrupt officers' criminal activity and what the defendants did (or did not do) as a result of that knowledge. Indeed, both sides rely on the defendants' depositions for the facts about the defendants' knowledge and actions.

received any acknowledgment that Internal Affairs was addressing the issues that had been raised. We have never supposed otherwise. On the other hand, we have never found any basis in the record for supposing that Sgts. Anderson and Terry believed that whoever took a citizen complaint would fail to notify Internal Affairs or that Internal Affairs would fail to investigate. To the contrary, Sgt. Anderson's testimony that he assumed Internal Affairs would be notified of any complaint and would investigate it stands uncontradicted.

2. In November of 1996—nine months after the arrests of Lynn and Beauchamp—Tate took a complaint from a man who said he had been robbed by Owens and another officer. Tate was later charged with testifying falsely before a grand jury in connection with this complaint. He was acquitted.

3. We shall refer to Anderson, Terry, Ferency, and Tate as "the defendants," because they are the only defendants involved in this appeal.

The plaintiffs point to no evidence contradicting those depositions.

It is true that the defendants challenge the district court's interpretation of the relevant deposition testimony. They challenge, for example, the court's statement that the defendants "did nothing" in response to the rumors of criminal activity. But this is not the sort of factual dispute that will preclude interlocutory review. The district court stated its understanding of the evidence in the course of answering a purely legal question—whether the facts alleged establish that the defendants violated the plaintiffs' clear constitutional rights.[4] The same legal question is now presented on appeal. The defendants have merely argued that, in answering the question, this court should consider the facts actually testified to in the relevant depositions, and not the district court's characterization of those facts. This seems right to us, given that the depositions are uncontradicted.

In sum, this appeal raises a pure question of law. Interlocutory review is therefore proper.

### III

■ The question whether the facts asserted by the plaintiffs demonstrate that the defendants violated their clearly established constitutional rights breaks down into two parts: (1) whether the plaintiffs have shown a violation by the defendants of a constitutionally protected right, and (2) whether a reasonable police supervisor would have understood that the defendants' conduct constituted such a violation. See, e.g., Shehee, 199 F.3d at 299–300.

The standard of review is de novo. See, e.g., id. at 299.

It seems clear that Owens, Redd, Hatcher, and Radford violated the plaintiffs' constitutional rights. Liability under § 1983 cannot be based on the doctrine of respondeat superior, however, see, e.g., id. at 300, so the plaintiffs must show that Anderson. Terry. Ferency, and Tate personally violated their rights. For supervisory liability to attach, the defendants must be shown to have encouraged the violation of the plaintiffs' rights "or in some other way directly participated in it." Id. (internal quotation marks omitted). "At a minimum," the defendants must have "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." Id. (internal quotation marks omitted).

Stated differently, supervisory liability will attach if the defendants possessed information revealing a "strong likelihood" of unconstitutional conduct by subordinate officers but did nothing to prevent the misconduct, thereby causing harm to the plaintiffs. See Doe v. City of Roseville, 296 F.3d 431, 439 (6th Cir.2002), cert. denied, 537 U.S. 1232, 123 S.Ct. 1357, 155 L.Ed.2d 196 (2003); Doe v. Claiborne County, Tenn., 103 F.3d 495, 513 (6th Cir. 1996). In such circumstances, the defendants are said to have exhibited "deliberate indifference" to violations of the plaintiffs' constitutional rights.

Taking the facts of the present case in the light most favorable to the plaintiffs, it is fair to say that the defendants knew, during the relevant time period,[5] that offi-

---

4. The district court denied the motion for summary judgment on the basis of its answer to that legal question. It did not deny the motion on the ground that there are genuine issues of material fact. A denial on the latter basis alone would not be immediately appeal-

able. See, e.g., Turner v. Scott, 119 F.3d 425, 427–28 (6th Cir.1997).

5. The relevant time period is from the second half of 1995, when Owens and Redd apparently began their criminal activity, through

cers under their command were probably stealing from citizens. Each of the defendants had heard rumors of criminal activity by officers in the platoon; each of the defendants was aware that certain officers were making large numbers of drug arrests without recovering significant amounts of cash; and each of the defendants, possibly excepting Sgt. Terry, knew of citizens' complaints of theft by officers of the third platoon. The defendants might not have known with certainty that specific officers were committing robberies, but the testimony leaves little doubt that they knew of a "strong likelihood" of criminal activity by officers under their supervision.

"[S]imple awareness of employees' misconduct," however, "does not lead to supervisor liability." *Leary v. Daeschner,* 349 F.3d 888, 903 (6th Cir.2003). The key question here is whether the defendants acquiesced in the rogue officers' violation of the plaintiffs' rights.

In answering that question, we are guided by undisputed evidence that sergeants and lieutenants in the Detroit Police Department are not responsible for investigating criminal activity by their subordinate officers. According to several witnesses from within the department, police supervisors in Detroit are neither trained nor instructed to look for evidence of criminality when reviewing officers' activities. Supervisors are expected to keep their eyes open for "anything amiss," but they focus on ensuring that reports are complete and accurate and that officers' time has been spent efficiently and productively. Discovery of criminal activity by subordinate officers is ordinarily made through the receipt of complaints from citizens. A supervisor's responsibility upon receiving a complaint is to report it to the Internal Affairs Division; Internal

Affairs then handles the investigation. Investigation by Internal Affairs—not by supervisors—is the tool by which the Department attempts to uncover criminality on the part of its officers.

Given these facts, we do not think the defendants' failure to investigate the corrupt officers amounts to acquiescence in the officers' misconduct or reflects indifference to violations of the plaintiffs' rights. The defendants were entitled to rely on Internal Affairs to perform its assigned function. The defendants' responsibility was to report specific complaints of criminality or misconduct that they themselves observed. None of the defendants personally observed any misconduct. Ferency and Tate received specific complaints and duly reported them. Ferency also reported generalized rumors of criminal activity. It was the reports to Internal Affairs that led, in time, to the officers' prosecution.

■ Unlike Ferency and Tate, Anderson and Terry received no specific complaints from citizens and made no reports to Internal Affairs. We are faced, therefore, with the question whether Anderson and Terry should have reported the widespread rumors of corruption or their own suspicions that certain officers were corrupt. In the circumstances of this case. we do not think the Constitution required such reports. Anderson believed—not unreasonably, given the Department's policies—that specific complaints had been reported by other supervisors. Anderson and Terry also had discussions with Ferency about the rumors and suspicions the latter had reported to Internal Affairs. Thus, Anderson and Terry had reason to understand that Internal Affairs had been alerted to the probable improprieties. Their failure to file cumulative reports—based only on

February 10, 1996, when Lynn and Beau-    champ were robbed and arrested.

rumor and surmise—does not, we believe, evince deliberate indifference. At worst, the silence of Anderson and Terry was "neglectful," and "that is not enough for section 1983 liability." *Claiborne County,* 103 F.3d at 513.

■ There has been no showing, moreover, that additional reporting of rumors would have prevented the plaintiffs' injury. The Internal Affairs investigation of the 6th Precinct took upward of two years. Even if there were evidence that additional reporting might have hastened the investigation, we could not conclude that the rogue officers would have been apprehended before February 10, 1996, a date only six months or so after the misconduct began. If the defendants' inaction did not cause the plaintiffs' harm—that is, if the plaintiffs would have been victimized regardless of any additional reporting— there can be no supervisory liability. See, *e.g., Camilo–Robles v. Hoyos,* 151 F.3d 1, 7 (1st Cir.1998); *Cantu v. Rocha,* 77 F.3d 795, 807 (5th Cir.1996).

Unlike *Taylor v. Michigan Dep't of Corrections,* 69 F.3d 76, 81 (6th Cir.1995), and *Hill v. Marshall,* 962 F.2d 1209, 1213 (6th Cir.1992), *cert. denied,* 509 U.S. 903, 113 S.Ct. 2992, 125 L.Ed.2d 687 (1993), this is not a case in which the defendants "personally had a job to do, and ... did not do it." The record demonstrates that it was not the defendants' job to investigate criminal activity by subordinate officers. Indeed, none of the witnesses whose depositions are in the record testified that the defendants should have investigated the officers or otherwise intervened. The defendants' responsibility was to ensure that Internal Affairs was alerted to the problem, and this was done. We see no viola-

tion by the defendants of the plaintiffs' constitutional rights.[6]

The order denying the defendants' motion for summary judgment is REVERSED, and this case is REMANDED for further proceedings consistent with this opinion.

CLAY, Circuit Judge, dissenting.

Inasmuch as the evidence in this case illustrates Defendants' actions and omissions indicating that Defendants knowingly acquiesced in violations of Plaintiffs' constitutional rights, I would affirm the district court's denial of qualified immunity. Since qualified immunity does not shield from liability for civil damages those officials whose "conduct [violates] clearly established statutory or constitutional rights of which a reasonable person would have known," *Scicluna v. Wells,* 345 F.3d 441, 444 (6th Cir.2003) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)), I respectfully dissent.

I.

As a purely legal determination, the district court's denial of qualified immunity in deciding a summary judgment motion is subject to *de novo* review. *Thomas v. Cohen,* 304 F.3d 563, 568 (6th Cir.2002). A moving party is entitled to summary judgment as a matter of law when there are no genuine issues of material fact. Fed. R.Civ.P. 56(c); *see also United Nat'l Ins. Co. v. SST Fitness Corp.,* 182 F.3d 447, 449 (6th Cir.1999). Furthermore, when deciding whether summary judgment is proper, we must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v.*

---

**6.** In light of our conclusion that the plaintiffs have not shown a violation of a constitutional right by the defendants, we are not called

upon to decide whether a reasonable supervisor would have understood the defendants' conduct to be unconstitutional.

*Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The majority opinion suggests that Defendants, based on the record in this case, had no duty to respond to the widespread, commonly known criminal conduct that permeated the walls of the City of Detroit's sixth police precinct's third platoon, other than to sporadically report a few citizen complaints of police misconduct to either Internal Affairs or other officers. What is not disputed is that Defendants, who directly supervised the rogue officers responsible for violations of Plaintiffs' constitutional rights, acted with deliberate indifference when confronted with daily rumors and discussion of their subordinates' criminal behavior. By looking the other way, or by failing to act when faced with apparently reliable reports of police corruption, Defendants actually contributed to the lawlessness of the third platoon by permitting its officers to continue to violate citizens' rights with impunity.

The majority relies on a sparse record to assert which acts the Defendants were and were not responsible to perform when confronted with knowledge of fellow officers alleged criminal behavior. Op. 385–386. In conceding Defendants' reasonable knowledge of a "strong likelihood" that the officers under their supervision were engaging in criminal activity, the majority opinion asserts that it is clear that Defendants had no duty, except to report citizens' complaints regarding any officer's alleged illegal activity. *Id.* However, it appears that much of Defendants' knowledge of the rogue officers' criminal behavior came not only from citizens' complaints, but also from precinct-wide rumors of illegal activities. The majority opinion would absolve law enforcement supervisory officers of all responsibility, as a part of their official duties, of taking reasonable steps to put an end to their subordinates' criminal behavior.

Although "simple awareness of employee's misconduct does not lead to supervisory liability," *Leary,* 349 F.3d at 903, if a genuine issue of fact nevertheless exists as to whether the Defendants were under an obligation to individually report to Internal Affairs any reasonable knowledge of subordinate officers' misconduct and official corruption, then summary judgment should not apply. *Id.* Nevertheless, as an interlocutory appeal, we will only review the question of qualified immunity with respect to the legality of Defendants' acts or omissions. This Court recently observed that,

> [q]ualified immunity involves a three-step inquiry. First, we determine whether, based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred. Second, we consider whether the violation involved a clearly established constitutional right of which a reasonable person would have known. Third, we determine whether the plaintiff has offered sufficient evidence 'to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.'

*Feathers v. Aey,* 319 F.3d 843, 848 (6th Cir.2003) (quoting *Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir.1999) (en banc)).

In the instant action, it has been established that Plaintiffs' constitutional rights were violated; however, questions remain as to the objective unreasonableness of Defendants' participation in the violations of clearly established law. There are obviously unresolved questions of material fact as to the breadth of Defendant officers' supervisory duties when confronted with their subordinates' illegal behavior; and whether their failure to discharge those

duties constitutes knowing acquiescence of existing or impending constitutional violations. *Vakilian v. Shaw*, 335 F.3d 509, 515 (6th Cir.2003) (citing *Poe v. Haydon*, 853 F.2d 418, 425–26 (6th Cir.1988) (stating that when genuine issues of material fact exist as to whether the officer committed acts that would violate a clearly established right, then summary judgment is improper)).

The record reveals that Defendants had knowledge that any and all acts of impropriety committed on duty were required to be reported. (J.A. at 647.) Lieutenants Tate and Ferency both conceded their knowledge of illegal acts performed by officers under their supervision; however, they both responded differently when describing their individual actions.

Lieutenant Tate admits to hearing of incidents of police misconduct; however, those incidents were learned through citizen reports, which were then properly logged and reported to Internal Affairs. (J.A. 640.) In addition, Tate admitted to hearing rumors about police misconduct, but could not properly characterize the rumors, or their origin. (J.A. at 640–41.) Nevertheless, Tate emphatically stated the duty of a reasonable officer, as he knows it:

A. Let me say this, if any Detroit Police member becomes aware of criminal activity by any other member, it is incumbent upon them to report that.

Q. Report it to who?

A. Well, through the chain, to Internal Affairs.

Q. What about if they hear rumors of possible criminal activity, are they obligated to report that?

A. If any Detroit Police member becomes aware of any criminal activity by any other member, they are supposed to report that. No, I don't recall any Detroit police lieutenant, sergeant, at that time at the 6th Precinct saying that they knew of any criminal activity on the part of any member at the 6th Precinct.

*Id.* at 641.

Lieutenant Ferency testified that he was aware of three incidents of officers' criminal activity about which citizens complained. (J.A. at 767.) Ferency testified that after each of those three citizen complaints, he "[m]ade the appropriate reports and the appropriate department notifications, and a desk blotter entry." *Id.*

Lieutenant Ferency also testified as to the duties of a Lieutenant:

Q: What do you do to supervise the sergeants who supervise police officers?

A: All I can say is I make sure things run smoothly.

Q: How do you do that?

A: When something breaks I try to fix it. I just try to be preemptive in the operation of the shift.

Q: How do you do that, what do you do?

A: Just by monitoring the sergeant's actions.

Q: What do you do to monitor sergeants' actions?

A: I see that they make activity log sheets. I see if they back up officers, monitor officers, see their runs. I question them as to what they perceive to be any possible problems on the shift.

Q: Anything else?

A: Just general observations. After all of these years of experience I have, if something goes awry, I try to correct— no, I do correct it.

(J.A. at 766.)

Although both Ferency and Tate admit to knowledge of illegal activity occurring under their supervision, under the majority's approach, they escape potential liabili-

ty by simply reporting such activity, and doing nothing else. Nevertheless, there are problems with this theory which the majority suggests absolves all Defendants of liability due to qualified immunity.

First, the rather unpersuasive theory that all Defendants had to do was report official corruption to Internal Affairs, and not take the matter further, should not absolve all of the Defendants because Sergeants Anderson and Terry did not report any complained of criminal activity to Internal Affairs. Anderson, as the majority opinion stated, was aware of the widespread suspicion of officers' criminal activity throughout the precinct, and frequently discussed such widespread suspicion about such activity with colleagues, but never officially reported such conversations or accusations. Anderson stated that these criminal incidents were discussed amongst sergeants and lieutenants, but stated that he never reported the incidents, as alleged by the majority. (J.A. at 750.) Anderson implied that the conversations were frequent and casual, as if they were common knowledge, but the conversations failed to suggest that any officers were taking responsibility for the reporting of these very widely known accusations. Anderson also testified that even when he monitored the runs of officers of whom he was suspicious, he saw no decrease in questionable narcotics arrests, yet he subsequently did "nothing." *Id.*

Terry also testified as to her knowledge of the rumors that officers under her supervision were engaged in criminal behavior and that such alleged behavior was repeatedly talked about in the lieutenants' and sergeants' room at the sixth precinct. Terry further testified that to her knowledge, nothing was done with respect to this information, even when it was widely known that certain officers were engaged in criminal activity. (J.A. at 722–723.) Terry did not report the alleged criminal conduct to Internal Affairs, nor can she say that she was aware that any of her supervisors reported such alleged criminal activity to Internal Affairs. *Id.*

Furthermore, contrary to the majority opinion's supposition, there is no testimony that either Lieutenants Ferency or Tate reported the allegations of officers' criminal conduct at the request or on the advice of Sergeants Anderson or Terry; nor is there evidence that Anderson or Terry received any acknowledgment or confirmation that these issues were being addressed or dealt with. Anderson and Terry, therefore, had no basis upon which to reasonably believe that any of the widespread allegations regarding rampant civil rights violations were being reported to Internal Affairs.[7] Instead, Defendants Anderson and Terry sat idly by and ignored the rumors, stories and allegations concerning the rogue officers, thus failing to do anything to stop the violation of citizens' civil rights.[8]

7. Terry only mentioned that she recalled Ferency and Tate being present when these discussions occurred, thus confirming the widespread knowledge of the alleged criminal activity. (J.A. at 722.) Terry also stated that she thought Lieutenant Tate might have filed a complaint at one point, but cannot be certain. (J.A. at 723.)

8. In footnote 1 of the majority opinion, the majority suggests that no evidence exists in the record to contradict Anderson and Terry's assumptions that Internal Affairs would be

notified of any complaints resulting from officers' criminal behavior. Nevertheless, we need not rebut evidence of Anderson's assumptions when it is unreasonable for supervising officers to believe that Internal Affairs was aware of reports of subordinate officers' criminal behavior when the Defendants themselves saw no corrective action being taken, and such abuses continued. The majority opinion absolves Sgts. Anderson and Terry of all liability under the unsupportable supposition that Anderson and Terry's assumptions

## II.

This Court in *Doe v. City of Roseville* attached qualified immunity to the defendants because there was no affirmative determination that the defendants, who were school administrators, were confronted "with conduct that was 'obvious, flagrant, rampant and of continued duration, rather than isolated occurrences,'" 296 F.3d 431, 440 (6th Cir.2002) (citing *Braddy v. Florida Dep't Labor & Employment Sec.*, 133 F.3d 797, 802 (11th Cir.1998)), or "with 'such widespread pattern of constitutional violations' [ ] that their actions demonstrated deliberate indifference to the danger of [the violator] abusing [more victims]." *Id.* (citing *Doe v. Claiborne County*, 103 F.3d 495, 513 (6th Cir.1996)). This standard, based upon the factual scenario we have in the instant action, supports the notion that Defendants herein are not entitled to qualified immunity.

It is difficult to disagree with the district court in its holding that the present case involves "supervisors who were presented with blatant, daily evidence of criminal activity that they chose to ignore." (J.A. at 1249.) This case is distinguishable from the current Sixth Circuit case law granting qualified immunity to officials in supervisory positions. For example, in *City of Roseville,* the plaintiff there lacked information regarding the defendants that " 'showed a strong likelihood that [the violator] would attempt to [commit the crime again], such that failure to take adequate precautions amounted to deliberate indifference to the constitutional right of [potential plaintiffs].' " 296 F.3d at 440 (quoting *Claiborne County,* 103 F.3d at 513). There, the court held that nothing the "defendants did or didn't do encouraged [the violator]'s abuse of [the victim], consti-

tuted participation in that abuse, or authorized, approved or knowingly acquiesced in it." *Id.*

In the instant case, admissions from the deposition testimony of all four Defendant supervisors establish that they were all aware of the criminal activity, and all testified that the conversations regarding their awareness of the criminal activity occurred on an almost daily basis from at least 1995 until beyond the day pertinent to this appeal, February 10, 1996. This matter greatly differs from *City of Roseville,* where school administrators lacked the necessary knowledge to prevent a teacher from continuously sexually abusing his students. *Id.* at 439–40. Here we are dealing with a police department whose very purpose is to promote and maintain lawful behavior within its jurisdiction. The implications of supervising officers acquiescing in the maintenance of the wall of silence that surrounded the third platoon's widely acknowledged criminal behavior are far more serious than the scenarios previously considered by this Court.

Nevertheless, even if we accept Defendants' reference to these actions as mere "rumors" or "suspicious activity," the reality of the scenario is that regardless of the terminology used to describe these occurrences, or Defendants' awareness of them, the Defendant supervisors' actions rose to the level of "tacit authorization" of the abuse of power by the rogue subordinate officers, resulting in constitutional injuries. *Bellamy v. Bradley,* 729 F.2d 416, 421 (6th Cir.1984).

Additionally, Defendant supervisors, as individuals directly responsible for ensuring the safety of all the citizens of Detroit, do so by insuring that all subordinate offi-

---

were reasonable and that the responsibility, and thus the fault, belongs with the anonymous or unidentified officers who supposedly

received citizen complaints or witnessed police misconduct first hand. The majority's argument in this regard is unpersuasive.

cers operate under the same rules. Arguments by Defendants' counsel that such responsibility does not lie within Defendant supervisors' job responsibilities, which included monitoring and reporting suspicious activity, and supervising individual police officers, is countered by the admissions of certain Defendants in deposition testimony, specifically Lieutenant Ferency. (J.A. at 1098–1100.) To word-smith one's self out of the responsibility of one's duties as a law enforcement supervisor, when one is aware of the lawbreakers under one's supervision, is not only unconscionable, but rather amounts to the "knowing acquiescence" of criminal behavior subject to potential liability. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir.1999).

Moreover, Defendants' arguments that they lacked the training and supervision to sufficiently monitor criminal activity is without weight. It would be a sad day for the Court if we were to accept the argument that these individuals obtained these supervisory positions in law enforcement without sufficient knowledge or ability to monitor criminal activity within their own ranks.

Furthermore, as determined by the district court, evidence of criminal conduct available to Defendant supervisors in the present case came from a variety of sources, each telling a consistent story. The decision of Defendant supervisors to ignore virtually all information concerning fairly open and blatant criminal activity on the part of their subordinates, and to refrain from taking any meaningful action in response to such information, is more than sufficient cause for denial of qualified immunity.

### III.

Given the descriptions of lieutenants' duties, it would seem that Lieutenants Tate and Ferency ultimately fell short of fulfilling their duty, particularly by merely passing on citizen complaints to Internal Affairs, and failing to take any further measure in response to inaction by Internal Affairs. The defense that an officer has no duty to ferret out criminal activity amongst other officers so long as the officer is not personally confronted with the citizens' complaints of criminal activity, even though the complaints may be widely known, is not only irresponsible, but also seems to fall within the "deliberate indifference" doctrine associated with supervisory liability for constitutional violations. *City of Roseville*, 296 F.3d at 439–40; *see also Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 254 (2d Cir.2001) (stating that personal involvement of a supervisory official may be established by, among other things, "deliberate indifference to the rights of [others] by failing to act on information indicating that unconstitutional acts were occurring.").

Assuming, *arguendo*, we accept the unpersuasive argument that Lieutenants Ferency and Tate's actions should be deemed acceptable because a reasonable supervising officer should only have to report citizen complaints and do nothing more, Sergeants Anderson and Terry would not benefit from this argument, and should, therefore, be denied qualified immunity. Nevertheless, because I disagree with the majority's contention that Lieutenants Ferency and Tate fulfilled their duties as supervisory officers, and that Sergeant Terry and Anderson's indifference was merely negligence, thus absolving all Defendants from potential liability, I respectfully dissent.